CV 12 6088

SUMMONS ISSUED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  DEC 1 1 2012  ★

LONG ISLAND OFFICE

WEXLER, J.
LINDSAY, M

| | |
|---|---|
| JOHN CRUZ, | ) |
| | ) |
| Plaintiff | )  CASE NO. |
| | ) |
| v. | ) |
| | ) |
| HSBC BANK USA, N.A., | ) |
| | ) |
| Defendant | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Preliminary Statement

Plaintiff, John Cruz ("Mr. Cruz"), through his undersigned attorney, brings this Complaint against Defendant HSBC BANK USA, N.A. ("HSBC Bank" or the "Bank") for wrongful termination and discrimination in the terms of his employment, committed by HSBC Bank against Mr. Cruz as retaliation for his reporting unlawful and illegal conduct, specifically money laundering and fraud, on the part of the Bank. As a result of such retaliatory conduct, Mr. Cruz lost his employment with the Bank and suffered damage to his profession and career. He seeks compensatory and punitive damages in an amount in excess of $10,000,000.

In furtherance of his Complaint, Mr. Cruz alleges the following:

# I. BACKGROUND

## Jurisdiction and Venue

1. This Court has jurisdiction over this Complaint pursuant to diversity jurisdiction, 28 U.S.C. § 1332(a)(1).

2. Defendant HSBC Bank USA, National Association ("HSBC Bank"), is the American subsidiary of HSBC Holdings, PLC, a British multinational financial services company.  HSBC Bank has its operational headquarters in New York City; its principal headquarters in McLean, Virginia; and numerous branch offices in the Counties of Brooklyn, Queens, Nassau, and Suffolk in the Eastern District of New York.  It is regulated by the Office of the Comptroller of the Currency ("OCC") and is a national bank chartered in the National Bank Act.

3. At the time of his filing of this Complaint, Plaintiff John Cruz ("Mr. Cruz") is domiciled in the District of Colorado, in the State of Colorado, and has been since 2010.

4. This Court has personal jurisdiction over the Defendant as it resides and does business in this District; and a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District.

5. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(a).

## Mr. Cruz & HSBC Bank

6. Mr. Cruz is a former Vice President and Senior Business Relationships Manager for HSBC Bank on Long Island, New York.  At all times pertinent to this Complaint, Mr. Cruz worked with or otherwise managed clients and their accounts from numerous Bank offices on Long Island and the New York Metro area.

2

7. At all times pertinent to this Complaint, each branch of the Bank that was located on Long Island, New York, had a branch manager who supervised the personnel assigned to that branch. In addition, some HSBC employees had job responsibilities that extended over a geographic area that encompassed more than one branch, but who worked out of a particular branch office. Mr. Cruz was one such employee. As such, he did not report to any branch manger, but reported to a supervisor having the title of Senior Vice President and Business Segment Leader.

8. Among the officers and employees with whom Mr. Cruz dealt while he was employed at the Bank were the following:

(a) Dean Bartoli: Senior Vice President & Business Segment Leader;

(b) Gloria Espanis: Assistant Vice President and Business Banking Specialist at the Bank's branch office in Carle Place, N.Y.;

(c) Patricia Heron: Assistant Vice President and Branch Operations Manager; she was responsible for the review and verification of documents regarding the proper identity of businesses and for owners' compliance to Anti-Money Laundering, Office of Foreign Assets Control, and Office of the Comptroller of the Currency regulations.

(d) Michael Jenkins: Senior Vice President & Business Segment Leader, and Mr. Cruz's supervisor;

(e) Paul Lewis: an HSBC underwriter;

(e) Vijaya Lingala: Vice President and Manager at the Bank's branch office in Northport, N.Y.;

(f) George Matranga: HSBC Bank Security Officer;

(g) Ralph Scannell: Branch Manager for the Northport branch of the Bank;

(h) Kishore Siva: Executive Vice President and District Executive for the Bank for Nassau and Suffolk Counties; all branch managers and team leaders reported directly to Mr. Siva;

(i) James "Jim" Young: Vice President and Manager at the Bank's branch office in Carle Place, N.Y.

9. Mr. Cruz began his employment at HSBC Bank on January 14, 2008. His immediate supervisors were Michael Jenkins and Dean Bartoli, who each reported to Kishore Siva.

10. At all times pertinent to this Complaint, Mr. Cruz was assigned accounts for numerous clients to manage and supervise. His client portfolio included business loans, deposit accounts, and investment accounts from approximately forty different branches on Long Island, including Northport, Carl Place, Commack, Walt Whitman Mall (Huntington), Smithtown, Centereach, Lake Ronkonkoma, Freeport, Levittown, Merrick, Mineola, and Franklin Square among other locations.

11. At all times pertinent to this Complaint, Mr. Cruz's physical workspace was located in the Melville branch office, in Suffolk County. His job responsibilities, however, required that he be "on the road," at the offices of clients or in the offices of other branches.

12. Mr. Cruz received his first performance review in January 2009. It was satisfactory.

### Anti-Money Laundering Requirements

13. At all times pertinent to this Complaint, the following terms had the following meanings:

(a) "AML" referred to Anti Money Laundering programs and regulations.

(b) "FinCEN" referred to the Financial Crimes Enforcement Network was an agency of the United States Department of the Treasury;

4

(c) "HSBC" referred to the global financial institution of which the HSBC Bank is a subsidiary; it included all the HSBC-related affiliate with offices in over eighty countries; the initials "HSBC" originally stood for Hong Kong Shanghai Bank Corporation.

(d) The "HSBC Group" referred to HSBC Holdings PLC, which is the parent corporation of HSBC.

(e) The "HBUS" referred to the HSBC Bank USA NA, that is, the Defendant HSBC Bank which is the United States affiliate of HSBC.

(f) The "HBMX" referred to HSBC Mexico, which is the Mexican affiliate of HSBC.

(g) The "OCC" referred to the Office of the Comptroller of the Currency of the United States Government.

(h) The "OFAC" referred to the Office of Foreign Assets Control of the United States Government.

(i) The "CCC Committee" referred to the HBMX Money Laundering Deterrence Communication and Control Committee within the HBMX.

### HSBC Bank's Prior Knowledge of Improprieties

13. Beginning on an unknown date prior to 2008, and continuing until the termination of Mr. Cruz' employment with HSBC Bank, the Bank was on notice that some of its offices, branches, and employees were involved in the unlawful and illegal laundering of money which represented the proceeds of criminal activity. A detailed description of this knowledge on the part of the Bank is described in the Staff Report of the Permanent Subcommittee on

Investigations of the United States Senate, dated July 16, 2011, titled: *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History*.

14. Among the general findings of fact made by the Senate Report that HSBC Bank was engaged in money laundering, and knew or was put on notice that it was engaged in money laundering, are the following:

(a) **Longstanding Severe AML Deficiencies.** HBUS operated its correspondent accounts for foreign financial institutions with longstanding, severe AML deficiencies, including a dysfunctional AML monitoring system for account and wire transfer activity, an unacceptable backlog of 17,000 un-reviewed alerts, insufficient staffing, inappropriate country and client risk assessments, and late or missing Suspicious Activity Reports, exposing the United States to money laundering, drug trafficking, and terrorist financing risks.

(b) **Taking on High Risk Affiliates.** HBUS failed to assess the AML risks associated with HSBC affiliates before opening correspondent accounts for them, failed to identify high risk affiliates, and failed for years to treat HBMX as a high risk accountholder.

(c) **Circumventing OFAC Prohibitions.** For years in connection with Iranian U-turn transactions, HSBC allowed two non-U.S. affiliates to engage in conduct to avoid triggering the OFAC filter and individualized transaction reviews. While HBUS insisted, when asked, that HSBC affiliates provide fully transparent transaction information, when it obtained evidence that some affiliates were acting to circumvent the OFAC filter, HBUS failed to take decisive action to confront those affiliates and put an end to conduct which even some within the bank viewed as deceptive.

(d) **Disregarding Terrorist Links.** HBUS provided U.S. correspondent accounts to some foreign banks despite evidence of links to terrorist financing.

(e) **Clearing Suspicious Bulk Travelers Cheques.** In less than four years, HBUS cleared over $290 million in sequentially numbered, illegibly signed, bulk U.S. dollar travelers cheques for Hokuriku Bank, which could not explain why its clients were regularly depositing up to $500,000 or more per day in U.S. dollar travelers cheques obtained in Russia into Japanese accounts, supposedly for selling used cars; even after learning of Hokuriku's poor AML controls, HBUS continued to do business with the bank.

(f) **Offering Bearer Share Accounts.** Over the course of a decade, HBUS opened over 2,000 high risk bearer share corporate accounts with inadequate AML controls.

(g) **Allowing AML Problems to Fester.** The OCC allowed HBUS' AML deficiencies to fester for years, in part due to treating HBUS' AML problems as consumer compliance matters rather than safety and soundness problems, failing to make timely use of formal and informal enforcement actions to compel AML reforms at the bank, and focusing on AML issues in specific HBUS banking units without also viewing them on an institution-wide basis.

15.  Among the specific findings of fact made by the Senate Report that HSBC Bank was engaged in money laundering, and knew or was put on notice that it was engaged in money laundering, are the following:

(a) Compliance and staffing levels for AML compliance were kept low despite the fact that staff was handling on average 3,800 suspicious activity alerts per person per month.  During a hiring freeze in 2007, Carolyn Wind, HSBUS Head of Compliance and AML Director, was told that she could not fill six open positions.  Her staff sought guidance from other banks to make a case for more personnel and learned that while HSBC filed an average of three to four Suspicious Activity Reports monthly, other banks were filing 30-75, and one major international

bank disclosed it was filing 250 monthly.  Ms. Wind brought her case for more personnel to the Board of Directors, which fired her one month later.  (Senate Report at 27.)

(b) One of the primary purposes of HBUS within the HSBC family was to give HSBC's foreign correspondent banks access to the U.S. banking system.  However, these foreign banks often had little or no AML procedures in place despite being at high risk for illegal activity. (Senate report at 302.)

(c) From 2000 to 2009, HSBC Group and HBUS gave Mexico their lowest AML risk rating despite overwhelming information that Mexico was a high risk jurisdiction for drug trafficking and money laundering.  During this time, HBMX shipped more US dollars to HBUS than any other Mexican bank and any other HSBC affiliate.  (Senate Report 38.)

(d) Drug traffickers were having trouble finding a U.S. bank to handle large amounts of cash.  For this reason they smuggled the cash into Mexico and deposited it with casas de cambio (CDCs), a virtually unregulated money service businesses that exchange foreign currency, which sold the dollars back to HBUS and also deposited them with HBMX.  (Senate Report 79.)

(e) HBMX failed to close accounts, on a timely basis, that had been ordered closed, with many closings delayed up to eight months while the customers were allowed to continue using the accounts.  Some closures even took up to three years.  (Senate Report at 74.)

(f) HSBU and HBMX were asked by United States regulators in January 2009 about their decision to stop buying and selling U.S. dollars.  They lied to the regulators, saying it was a cost cutting measure, while never mentioning that it was done over concern about money laundering problems with the CDCs.  (Senate Report 76.)

(g) In March, 2007, one of the banks largest Mexican customers, Mr. Ye Gon, was arrested and indicted on drug trafficking charges. In May, 2007, Casa de Cambio Puebla ("Puebla"), a Mexican financial institution, had $11 million seized from its account then deposited in Wachovia Bank. These events generated large scale publicity. Puebla was a customer of HBMX, and the CCC Committee decided to keep open the accounts of Puebla and other related defendants despite these events. (Senate Report at 82.)

(h) In January, 2008, yet another client of HSBC, the Sigue Corporation, a U.S. Licensed money service business that transferred millions of dollars to Mexico, entered into a deferred prosecution agreement for violating money laundering laws and forfeited $15 million in suspect funds. Nonetheless, HBMX decided to retain the account. (Senate Report at 86-87.)

(i) Another example of wrongdoing was the maintenance by HBMX of tens of thousands of U.S. dollars accounts maintained in a shell operation in the Cayman Islands that had no physical presence. Deposits peaked in 2008 at $2.1 billion. Almost 15% had no KYC (Know Your Customer) information, so HSBC had no idea who or what was behind these accounts. Many of the rest were used by organized crime. (Senate Report at 91.)

(j) Another example of how HBMX introduced risk into HBUS, was the cashing of hundreds of millions of dollars of Travelers Cheques through correspondent banks under suspicious circumstances. (Senate Report at 99.)

(k) By buying and paying cash for travelers cheques, and then cashing those checks in other banks in different countries, those who are drug traffickers, terrorists, and otherwise criminal can engage in the international movement of money. HBMX was responsible for nearly one-third of all travelers cheques sold by HSBC in the world; and the United Kingdom

representing another third. HBMX was selling them without limits and cashing them for customers and non-customers alike.  (Senate Report at 100.)

(l) Another example was the large amount of bulk transfers of cash to HBUS by HBMX, more than any other bank in Mexico and any other HSBC affiliate.  While bulk transfers are a normal part of the banking business, HSBC was conducting them in many high-risk countries plagued by drug trafficking and corruption without distinguishing between high-risk and low-risk.  For a three-year period, from mid-2006 until mid-2009, HBUS accepted more than $15 billion in physical U.S. dollars from other HSBC affiliates, but failed to conduct any AML monitoring of the bulk cash transactions. (Senate Report at 104-06.)

(m) HSBC circumvented OFAC safeguards designed to prevent transactions with persons and entities engaged in nuclear proliferation, drug kingpins, and persons associated with rogue jurisdictions, such as Iran and North Korea.  For years from 2000-2010, HSBC affiliates sending OFAC sensitive transactions involving Iran through their US correspondent accounts at HBUS took steps to conceal them. (Senate Report at 112.)

(n) From at least 2002 to 2007, HSBC affiliates processed potentially prohibited U.S. dollar transactions involving Cuba. (Senate Report at 169.)

(o) From at least 2005 to 2008, HSBC affiliates processed potentially prohibited U.S. dollar transactions involving Sudan. (Senate Report at 171.)

(p) From at least 2005 to 2010, HSBC affiliates processed potentially prohibited U.S. dollar transactions involving Burma. (Senate Report at 173.)

(q) From at least 2005 to 2007, HSBC affiliates processed potentially prohibited U.S. dollar transactions involving North Korea. (Senate Report at 175.)

(r) For decades, and after the terrorist attacks of September 11, 2001, HSBC provided a wide range of services to Al Rajhi Bank, Saudi Arabia's largest private bank, despite knowing that the bank and some of its owners had connections with organizations linked to financing terrorism, including that one of the bank's founders was an early benefactor of al Qaeda. (Senate Report at 188.)

(s) HSBC serviced at least two other banks with suspected links to terrorism financing: Islami Bank Bangladesh Ltd. and Social Islami Bank Ltd. (Senate Report at 225.)

(t) "With few questions asked and despite ongoing evidence of suspicious activity, HBUS cleared tens of millions of dollars per year in bulk travelers cheques for Hokuriku Bank of Japan. According to Hokuriku Bank, from 2005 to October 2008, HBUS cleared travelers cheques totaling between $70 million and $90 million per year for the bank, producing a grand total in less than four years of more than $290 million." (Senate Report at 241.)

(u) "Over the course of a decade, HBUS allowed over 2,000 customers to open accounts in the name of bearer share corporations, a type of corporation that allows secrecy by assigning ownership to whomever has physical possession of the shares." (Senate Report at 241.)

## The Discovery by John Cruz of Illegal Conduct by HSBC Bank

15. On or about January 1, 2009, HSBC Bank assigned to him the "Goldenberg Account" from the Northport branch office, on Long Island. This account was valued over $850,000,000 in terms of revenue and deposits.

16. Upon examination of the account, Mr. Cruz observed that multiple corporations or affiliates were involved with it. These entities operated in Manhattan and Queens, in New York.

He decided to visit a site for the businesses, located in Manhattan, to learn why the businesses were doing their banking in Northport.

17.  When he arrived at the Manhattan address for the businesses, he could not locate any of them.  He inquired about them with the building's management office, and was informed that none of the businesses ever existed in that building.

18.  Mr. Cruz's examination of the Goldenberg's account activity showed that money was actively being deposited and withdrawn, but he could not identify where the money was going; and showed that the money was being deposited through PayPal transactions, or through handwritten General Ledger credit tickets prepared by a bank employee, in amounts which made these transactions abnormal.

19.  Mr. Cruz notified his supervisor, Michael Jenkins, of what he found, and that the account needed to be investigated and reported to the Government.   Mr. Jenkins told Mr. Cruz that this was an $800 million account; that he was not going to lose it; and that Mr. Cruz was to go back to doing his job.

20.  In response to Mr. Jenkins' inaction, Mr. Cruz looked at the Social Security Number on the Goldenberg account and ran a check on it using the Bank's computer records.  This returned five thousand four hundred forty-nine (5,449) accounts.  Of these, approximately 80% were identified as attorney escrow accounts; three hundred fifty-one (351) appeared to be business accounts; and two hundred sixty-seven (267) seemed clearly to be fraudulent.

21.  Mr. Cruz again went to his supervisors, including Patricia Heron, George Matranga, and Ralph Scannell, bringing this information to their attention; and asked Ms. Heron why no suspicious activities report had yet been filed as required by the OCC.   Ms. Heron agreed that

the account seemed suspicious, but told him that Kilshore Siva had authorized keeping the account open.

22.   After Mr. Cruz reported his findings about the Goldenberg account to his supervisors, the Bank denied Mr. Cruz access to the relevant part of the Bank's computer system; and the Bank failed to file a suspicious activity report with FinCEN concerning the account as required by federal law and regulations.

23.   After these incidents, Mr. Cruz began to examine additional accounts, including that of the S&S Corporation ("S&S").

24.   Mr. Cruz made a telephone call to S&S using the telephone number listed for it in the Bank's records, but could not contact the company.  He also pulled an account report for S&S, and noticed that the company had loans, cash, and transfers, but that it had no checks.

25.   Mr. Cruz did a "site check," driving to the business address of S&S, and found an empty lot.

26.   Mr. Cruz reported all of this to Mr. Jenkins, and was told to leave it alone.  Mr. Cruz removed the account from his portfolio, but found that it was re-inserted.  He took it out again; and it was again reinserted.  He again complained to Mr. Jenkins, but nothing happened.

27.   Another account that did not exist was for Pillar, Inc. ("Pillar").  Mr. Cruz also did a site check for Pillar, but found that the company was not located at its listed address.

28.   Mr. Cruz found that additional accounts were listed as "unidentified," and they were in fact unidentifiable.  Upon examination, he observed account categories, such as checking, loans, etc., but there were no transactions.

28. Mr. Cruz identified approximately fifty more phony or fraudulent accounts. In addition, accounts were being added and removed from Mr. Cruz' portfolio without him being informed of these changes.

29. As additional examples of accounts which Mr. Cruz determined to be phony or fraudulent, and the basis for his reaching such conclusion, are the following:

**(A) National Mutual, Inc:**

1. There were no tracking numbers for outgoing or incoming electronic transactions.

2. Regarding outgoing electronic transactions, destinations and tracking numbers were not listed, so tracing the funds was not possible.

3. Regarding incoming electronic transactions, no information is to the origination of the funds, and no tracking number.

4. The company did not exist at the physical address listed.

5. The physical loan documentation, or file, for this client did not exist. Also, the information required for KYC (Know Your Customer) was not completed in computer system.

**(B) Educational Services & Products, LLC:**

1. There were no tracking numbers for outgoing or incoming electronic transactions.

2. Regarding outgoing electronic transactions, destinations and tracking numbers were not listed, so tracing the funds was not possible.

3. Regarding incoming electronic transactions, no information is to the origination of the funds, and no tracking number.

4. Hand written journal entries were used for deposit returns instead of normal electronic or computer transactions; and the deposits were never made.

5. Hand written journal entries were used for returns of electronic deposits; the transaction could not be traced.

6. The physical loan documentation, or file, for this client did not exist. Also, the information required for KYC (Know Your Customer) was not completed in computer system.

7. No suspicious activities reports were completed for those transactions over $10,000.00.

8. The account was linked to thousands of accounts within HSBC throughout the world.

**(C) ETS Express Corp**:

1. There were no tracking numbers for outgoing or incoming electronic transactions.

2. Regarding outgoing electronic transactions, destinations and tracking numbers were not listed, so tracing the funds was not possible.

3. Regarding incoming electronic transactions, no information is to the origination of the funds, and no tracking number.

4. Hand written journal entries were used for deposit returns instead of normal electronic or computer transactions; and the deposits were never made.

5. Hand written journal entries were used for returns of electronic deposits; the transaction could not be traced.

6. The physical loan documentation, or file, for this client did not exist. Also, the information required for KYC (Know Your Customer) was not completed in computer system.

7. No suspicious activities reports were completed for those transactions over $10,000.00.

8. Although tax returns submitted for prior loans were not complete or signed, loans were approved.

9. The account was linked to thousands of accounts within HSBC throughout the world.


**(D) Extravantage FO:**

1. There were no tracking numbers for outgoing or incoming electronic transactions.

2. Regarding outgoing electronic transactions, destinations and tracking numbers were not listed, so tracing the funds was not possible.

3. Regarding incoming electronic transactions, no information is to the origination of the funds, and no tracking number.

4. Hand written journal entries were used for deposit returns instead of normal electronic or computer transactions; and the deposits were never made.

5. The physical loan documentation, or file, for this client did not exist. Also, the information required for KYC (Know Your Customer) was not completed in computer system.

6. No suspicious activities reports were completed for those transactions over $10,000.00.

7. Although tax returns submitted for prior loans were not complete or signed, loans were approved.

**(E) JSP Contracting 2 INC:**

1. There were no tracking numbers for outgoing or incoming electronic transactions.

2. Regarding outgoing electronic transactions, destinations and tracking numbers were not listed, so tracing the funds was not possible.

3. Regarding incoming electronic transactions, no information is to the origination of the funds, and no tracking number.

4. Hand written journal entries were used for deposit returns instead of normal electronic or computer transactions; and the deposits were never made.

5. The physical loan documentation, or file, for this client did not exist. Also, the information required for KYC (Know Your Customer) was not completed in computer system.

6. No suspicious activities reports were completed for those transactions over $10,000.00.

7. Although tax returns submitted for prior loans were not complete or signed, loans were approved.


**(F) Global Worldwide Int'l, Inc,:**

1. There were no tracking numbers for outgoing or incoming electronic transactions.

2. Regarding outgoing electronic transactions, destinations and tracking numbers were not listed, so tracing the funds was not possible.

3. Regarding incoming electronic transactions, no information is to the origination of the funds, and no tracking number.

4. Hand written journal entries were used for deposit returns instead of normal electronic or computer transactions; and the deposits were never made.

5. The physical loan documentation, or file, for this client did not exist. Also, the information required for KYC (Know Your Customer) was not completed in computer system.

6. No suspicious activities reports were completed for those transactions over $10,000.00.


**(G) Pillar Capital Holdings LLC:**

1. There were no tracking numbers for outgoing or incoming electronic transactions.

2. Regarding outgoing electronic transactions, destinations and tracking numbers were not listed, so tracing the funds was not possible.

16

3. Regarding incoming electronic transactions, no information is to the origination of the funds, and no tracking number.

4. Hand written journal entries were used for deposit returns instead of normal electronic or computer transactions; and the deposits were never made.

5. The physical loan documentation, or file, for this client did not exist. Also, the information required for KYC (Know Your Customer) was not completed in computer system.

6. No suspicious activities reports were completed for those transactions over $10,000.00.

7. Although tax returns submitted for prior loans were not complete or signed, loans were approved.

### The Reporting by Mr. Cruz of Suspicious Activity

30.  Beginning in mid-July 2009, John Cruz sought to formally report his suspicions of fraudulent accounts, first to his superior Michael Jenkins, but received no response.  As a result, he reported the same suspicions to James Young. At Mr. Young's suggestions, he met with George Matranga of HSBC Security on July 28, 2009.  Exhibit A attached to this Complaint is an email correspondence between Mr. Cruz and Mr. Jenkins confirming and describing this meeting.

31.  During that meeting, Mr. Matranga told Mr. Cruz that there had been an ongoing investigation of the previous manager of the East North Branch of the HSBC Bank, Vijaya Linyala, and that he was investigating some $900 million in suspicious transactions in the Bank's branches in Suffolk County, on Long Island.  Mr. Cruz and Mr. Matranga discussed the ongoing findings of billions of dollars in fraudulent transactions across the US including possible money laundering, fraudulent loans, and related matters.  Mr. Cruz tape recorded this conversation.

32.  After this meeting with Mr. Matranga, Mr. Cruz was finally offered a meeting with Mr. Gerald Funk of HSBC, Senior. Vice President for Long Island, in response to his requests made to Mr. Jenkins.

32.  At about this time, Michael Jenkins wrote-up Mr. Cruz, purportedly for poor job performance.

33.  Thereafter, Mr. Cruz called Mr. Matranga to request a second meeting concerning yet more suspicious activities that he had observed taking place within HSBC Bank.  However, Mr. Matranga told Mr. Cruz that he was no longer allowed to speak with Mr. Cruz; and that Bank wanted his information concealed.  During this conversation, Mr. Cruz informed Mr. Matranga that Michael Jenkins had written-him-up for poor job performance, but in reality this was because of his identifying and reporting unlawful activities taking place within Bank.  Mr. Matranga informed Mr. Cruz that eventually he was going to be terminated because he knew too much about such activities.

34.  After this conversation, Mr. Cruz went into the office of Mr. Young and discussed with him his phone conversation with Mr. Matranga.  Mr. Young stated that Mr. Jenkins was trying to cover up matters so as to protect himself, including writing-up Mr. Cruz for this purpose.  Mr. Young did not explain why Mr. Matranga, of HSBC Security would not speak with Mr. Cruz.  Mr. Cruz tape recorded this conversation.

35.  Because of his concerns, Mr. Cruz retained an attorney.  Based on the advice of his attorney, Mr. Cruz notified his supervisors, Mr. Jenkins and Kishore Siva, that he was going to bring his information to the attention of regulatory and law enforcement agencies. He sent an email (Exhibit B), dated October 2, 2009, to these individuals explaining:

> On the advice of my attorney, he has requested that I notify HSBC immediately of illegal activities which were done by former employees of HSBC in using my name.  I am sure that you can appreciate that I need to protect myself from false accusations as well as protecting HSBC.
>
> My attorney has strongly recommended I report these activities to State and Federal authorities immediately.  I would appreciate HSBC's input as to how they would like me to proceed.

36.  While these discussions and email exchanges were ongoing, Mr. Cruz continued to experience retaliation from HSBC for his disclosures and observations, and he reported these observations and the resulting retaliation, including adverse effects on his employee performance evaluations, to Michael Jenkins. (Attachments C and D.)

37.  On October 19, 2009, Mr. Cruz received an email from Maria Malanga of HSBC Human Resources. (Attachment E.)  In her email, Ms. Malangia:

(a) Ms. Malangia first summarized Mr. Cruz' concerns that he had been previously expressed to management, including:

1. You expressed concern that there was fraudulent activity in the East Northport Branch and that you were uncovering more and more each day and that you reported your concerns to Security and Management but you feel that nothing is being done about it.

(b) Ms. Malangia then continued by acknowledging that fraudulent accounts existed:

1. Security and the Management team are appropriately following through on the fraudulent activity discovered in the East Northport Branch. Please understand that you will not be advised of the specifics regarding these kinds of investigations. However, you have been advised by your manager, Michael Jenkins, that if any impact of this fraud is in any way related to accounts in your portfolio, you will not be held accountable. If you are concerned about specific examples of fraudulent activity, you need to provide those specifics to your manager for review and handling. The accounts that you see being closed at the branch are unrelated to any 'fraud' issues or to your portfolio.

(c) Ms. Malangi also attempted to shift blame to Mr. Cruz for supposedly failing to adequately documenting unlawful activity at the Bank:

John, please understand that when you raise allegations of this nature, there is an expectation that you will provide the specific details to back up your claims. Failure to do so prevents us from properly investigating your complaints. It is our expectation that if you raise these types of complaints in the future that you provide the necessary details that substantiate your allegations.

(d)  This complaint and allegation about Mr. Cruz was knowingly false when made, in that Mr. Cruz tried unsuccessfully to report his concerns to his supervisor, Mr. Jenkins; did report his concerns to Mr. Matranga; and at all times the Bank had access to the same documents, for the same accounts, as did Mr. Cruz.

38.  Mr. Cruz continued to document unlawful and suspicious activity at the Bank. Among other actions that he took, Mr. Cruz visited the Law Offices of Prashanthi Reddy, LLC, for whom an account existed in the East Northport branch office of the Bank.  Mr. Reddy told Mr. Cruz that he had no such account.

39.  After this conversation with Ms. Prashanthi, Mr. Cruz sent to Paul Lewis, an HSBC underwriter, and to Ms. Jenkins and Mr. Matranga an email concerning his discussions with Ms. Reddy. (Attachment F.)  He continued to communicate with Mr. Matranga about these and related matters.  (Attachments F and G.)

40.  In January 2010, Mr. Cruz received an email requesting information about two accounts in his portfolio: United Express Agency and ETS Express.  Thereafter, Mr. Jenkins, his manager filed a Corrective Action complaint against him regarding these accounts, despite the fact that Mr. Cruz had reported suspicious activity regarding these same account some six months earlier, including reporting that millions of dollars had passed through the accounts through PayPal; and he had been told to stay away from these accounts. (Attachments H and I.)

41.  On February 17, 2010, HSBC Bank terminated his employment.  Among the reasons given were the following:

(1)  That he had raised allegations about fraudulent and unlawful accounts without providing specific details, preventing the Bank from properly investigating his complaints; for the reasons set forth above, this was false, and the reason for the this criticism was to enable the

Bank to conceal and cover-up the fraudulent and unlawful accounts it had placed into Mr. Cruz's portfolio and to enable its deniability as to its knowledge of the nature of these accounts.

(2) That his performance was unacceptable; whereas in truth and fact, his performance had been rated satisfactory, and continued to be satisfactory; and the reason for the change in this rating was that he had begun to report fraudulent and unlawful accounts that he had observed and investigated in his portfolio, and had reported to his supervisors and to HSBC Security.

42.  By letter dated February 25, 2010, HSBC Bank accused Mr. Cruz of downloading to his personal email address a large quantity of "confidential HSBC customer account information" in violation of HSBC policy, and demanding that he destroy that information.  In truth and fact, the emailing of such information in such manner was not in violation of HSBC policy and practice in that HSBC customer relationship managers were allowed to take home such information so as to enable them to work on customer accounts at home; and Mr. Cruz had informed his supervisors, as described above, that, on advice of counsel, he intended to provide such information to state and federal authorities, as required by law including 18 U.S.C. § 4. HSBC Bank demanded that Mr. Cruz destroy the information described so as to conceal and cover-up the fraudulent and unlawful accounts it had placed into Mr. Cruz's portfolio and to enable its deniability as to its knowledge of the nature of these accounts.

43.  At all times pertinent to this Complaint, HSBC Bank, as a collective entity, knew and was otherwise on notice that accounts within the Bank were fraudulent and otherwise unlawful; and that accounts at the Bank were being used for drug money laundering, drug trafficking, terrorist financing risks, and in aid of other criminal activity; and took the aforesaid retaliatory and coercive conduct against Mr. Cruz, and terminated Mr. Cruz from employment with the

Bank, for the purpose of quieting and discrediting Mr. Cruz regarding his reporting of these activities, and to otherwise conceal and cover up these activities.

## COUNT I

### (Breach of Contract)

44.  Plaintiff John Cruz realleges and incorporates by referenced the allegations contained in paragraphs one through forty-three of this complaint and further alleges:

45.  On or about January 22, 2008, Plaintiff John E. Cruz entered into an employment agreement with HSBC Bank, NA.  As part of, and incorporated in that employment agreement was the HSBC Certificate of Compliance (the "HSBC Compliance Certificate"), signed on this date by John E. Cruz on behalf of himself, and by John F. Young on behalf of the Bank.

46.  Among the provisions and requirements contained in the HSBC Compliance Certificate were the following:

12. I understand that I am required to report immediately to the General Counsel of my subsidiary (or to such person as the General Counsel shall designate) or to the General Counsel of the Corporation, any conduct or activity engaged in by any employee of the Corporation or one of its agents which I know or suspect involves fraud or criminality or which may expose the Corporation to liability.  I have no knowledge of any such conduct or activity, except as specifically set forth below.

13. I understand that I am required to report immediately to the General Counsel of my subsidiary (or to such person as the General Counsel shall designate) or to the General Counsel of the Corporation any conduct or activity engaged in by any entity with a creditor-debtor relationship with the Corporation which I know or suspect involves fraud or criminality or which may expose the Corporation to liability.  I have no knowledge of any such conduct or activity, except as specifically set forth below.

14. I have read and/or been trained in, understand and will adhere to the policies and procedures of any business unit I work for as they relate to compliance with the law and apply to my responsibilities.

47. Among the policies and procedures of the business unit of the Bank that John E. Cruz worked was the HSBC Anti-Money Laundering Initiative ("AML Initiative" or the "Initiative"). This Initiative was incorporated into the HSBC Compliance Certificate and, through this Compliance Certificate, the employment agreement between John E. Cruz and HSBC Bank.

48. The AML Initiative provided in pertinent part as follows:

Anti-Money Laundering or AML is a worldwide initiative to block the flow of illegal or illicit funds through financial institutions. Since 9/11, it also includes an initiative to deter the financing of terrorism.

**Money Laundering is typically done in three phases:**

- Placement of funds into the financial institution

- Layering of the funds among various accounts

- Integration of the funds into the market – for example through the purchase of assets (i.e., real estate, cars, electronic equipment, withdrawal of cash, etc.)

**Legislation that Impacts anti-money laundering:**

- Bank Secrecy Act of 1970

- Money Laundering Control Act of 1986

- The USA Patriot Act of 2001

**Your Obligation as an HSBC Employee:**

* * * * *

- Report suspicious activity

49. At all times pertinent to this Complaint, the aforesaid provisions of the Certificate of Compliance and the AML Initiative comprised terms and conditions of Mr. Cruz's employment agreement with HSBC Bank and were in full effect as such.

50. Beginning in mid-July 2009, John E. Cruz reported his suspicions concerning money laundering and fraudulent bank accounts, occurring at and engaged in by HSBC Bank, to Michael Jenkins, to James Young, and to George Matranga, and to Maria Malanga, among others within HSBC Bank, in accord with the terms and conditions of his employment agreement with the Bank.

51. In direct retaliation for Mr. Cruz complying with and fulfilling the terms and conditions of his employment contract with the Bank, as described above, the Bank terminated Mr. Cruz from his employment with the Bank.

52. The aforesaid termination by the Bank of Mr. Cruz comprised a breach by the Bank of Mr. Cruz's employment contract with the Bank.

53. As a direct result of this breach of contract by the Bank, Mr. Cruz suffered damages in the form of loss of his salary, commissions, bonuses, and benefits in an amount to-date of approximately $400,000.

## COUNT II

### (Breach of the Covenant of Good Faith and Fair Dealing)

54. Plaintiff John Cruz realleges and incorporates by referenced the allegations contained in paragraphs one through forty-three, and forty-five through forty-eight of this complaint and further alleges:

55. At all times pertinent to this Complaint, the aforesaid provisions of the Certificate of Compliance and the AML Initiative comprised a covenant that, if Mr. Cruz complied with these provisions he would not suffer any adverse or retaliatory effect upon the terms and conditions of his employment with the Bank.

56. Beginning in mid-July 2009, John E. Cruz reported his suspicions concerning money laundering and fraudulent bank accounts, occurring at and engaged in by HSBC Bank, to Michael Jenkins, to James Young,

and to George Matranga, and to Maria Malanga, among others within HSBC Bank, in accord with the provisions of the Certificate of Compliance and the AML Initiative.

57.  In direct retaliation for having complied with the provisions of the Certificate of Compliance and the AML Initiative, the Bank terminated Mr. Cruz from his employment with the Bank.

58.  The aforesaid termination by the Bank of Mr. Cruz comprised a breach by the Bank of its covenant of good faith and fair dealing with Mr. Cruz' in the terms and conditions of his employment with the Bank.

59.  As a direct result of this breach of contract by the Bank, Mr. Cruz suffered damages in the form of loss of his salary, commissions, bonuses, and benefits in an amount to-date of approximately $400,000.


## COUNT III

### (Tort of Retaliatory Discharge)

60.  Plaintiff John Cruz realleges and incorporates by referenced the allegations contained in paragraphs one through forty-three, and forty-five through fifty-three of this complaint and further alleges:

61.  In October 2009, Mr. Cruz contacted Assistant District Attorney Jeremy Schelleppe and Investigator Patrick Mulcahey of the District Attorney's Office of Suffolk County; and Special Agents Frank DiGregorio and Graham Klein of the U.S. Department of Homeland Security.   He provided all of his information and documents concerning the fraudulent and unlawful loans and accounts at HSBC Bank to these individuals and their agencies at this time.

62.  Effective October 2, 2009, HSBC Bank was put on notice that Mr. Cruz was providing this information to these federal and state emails, as a result of his email dated October 2, 2009.  (Attachment B.)

25

63.  At all times pertinent to this Complaint, the conduct of HSBC Bank violated federal criminal law, including 18 U.S. C. § 1005, a felony.  Specifically, HSBC Bank and its corporate officers violated the following paragraph of 18 U.S. C. § 1005:

> Whoever makes any false entry in any book, report, or statement of such bank, company, branch, agency, or organization with intent to . . . deceive any officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System [shall be guilty of a felony].

64.  In addition, HSBC Bank and its corporate offices violated the federal criminal Anti-Money Laundering Statutes, 18 U.S.C. § 1956 and § 1957, doing so both directly and by aiding and abetting such conduct in violation of 18 U.S.C. § 2; all such violations being felonies.

64.  At all times pertinent to this Complaint, Mr. Cruz was obligated by federal law to report the aforesaid violation of federal to federal and state law enforcement authorities.  Specifically, Mr. Cruz was obligated to do so by 18 U.S.C. § 4, which requires:

> Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be [guilty of a felony].

65.  HSBC Bank knowingly and intentionally:

(a) engaged in discriminatory and retaliatory conduct against Mr. Cruz, as described above, in order to deter, dissuade, and prevent Mr. Cruz from fulfilling his obligation under federal criminal law to report and provide his information concerning fraudulent and unlawful loans and accounts at the Bank to the above federal and state law enforcement personnel and agencies, and to coerce Mr. Cruz into committing a felony by violating 18 U.S.C. § 4, all upon pain of losing the financial and career benefits of his employment with the Bank; and

(b)  terminated Mr. Cruz from his employment with the Bank in direct retaliation for him having fulfilled his obligation under federal criminal law to report and provide his information concerning fraudulent and unlawful loans and accounts at the Bank to the above federal and state law enforcement personnel and agencies.

66.  The aforesaid conduct of the HSBC Bank comprised tortious retaliatory conduct.

67.  As a direct result of this breach of contract by the Bank, Mr. Cruz suffered damages in the form of loss of his salary, commissions, bonuses, and benefits in an amount to-date of approximately $400,000.

## REQUEST FOR RELIEF

Plaintiff John Cruz asks for judgment in his favor as follows:

1.  Judgment be entered against Defendant HSBC Bank and in favor of Plaintiff on Counts One through Three in the amount of $400,000  for compensatory and special damages for lost wages, commissions, bonuses and benefits;

2.   Judgment be entered against Defendant HSBC Bank and in favor of Plaintiff on Counts One through Three for front pay, commissions, bonuses, and benefits, in an amount to be determined at trial;

3.   Judgment be entered against Defendant HSBC Bank and in favor of Plaintiff on Count Three for punitive damages in the amount of ten mllion dollars;

4.  Plaintiff John Cruz be awarded attorneys' fees costs, and expenses;

5.  Defendant HSBC Bank be ordered to re-employ Plaintiff John Cruz, with all increase in wages, commissions, bonuses and benefits that he should have accumulated since he was wrongfully terminated;  and

6.  Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff John Cruz requests trial by jury of all claims that may be tried in the United

States District Court for the Eastern District of New York.

Respectfully Submitted,

/s/Andrew Grosso

Andrew Grosso, Esq.
ANDREW GROSSO & ASSOCIATES
GEORGETOWN PLACE
1101 THIRTIETH STREET, NW, SUITE 300
WASHINGTON, D.C.  20007
(202) 298-6500 Tel.
(202) 298-5599 Fax
Agrosso@acm.org Email

Nicholas J. Damadeo
NICHOLAS J. DAMADEO, P.C.
ATTORNEYS FOR PLAINTIFF
27 WEST NECK ROAD
HUNTINGTON, NY  11743
(631) 271-7400 Tel.
(631) 271-7411 Fax
Nick@damadeolaw.com Email